UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

      Plaintiff,

   vs.                     REPORT AND RECOMMENDATION

Bradley James TeJohn,

        Defendants.       Crim. No. 06-179 (RHK/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Defendant's Motion to Suppress Statements, Admissions, and Answers.  A Hearing on the Motions was conducted on July 10, 2006, at which time, the Defendant appeared personally, and by Katherian D. Roe, Federal Public Defender, and the Government appeared by Thomas M. Hollenhorst, Assistant United States Attorney.

For reasons which follow, we recommend that the Defendant's Motion to Suppress Statements, Admissions, and Answers, be denied.

## II.  Factual Background

The Defendant has been charged with one Count of assault resulting in serious bodily injury, in violation of Title 18 U.S.C. §§113(a)(6), 1151, and 1153(a). The events which give rise to that charge are alleged to have occurred on or about May 8, 2006, in this State and District, and within the exterior boundaries of the Red Lake Indian Reservation. As pertinent to that charge, and to the Motion now before us, the operative facts may be briefly summarized.[1]

At the Hearing, Jeffrey Tisak ("Tisak"), and Asher Silkey ("Silkey"), who are both Special Agents for the Federal Bureau of Investigation ("FBI"), testified at the instance of the Government. According to their testimony, law enforcement officers interviewed the Defendant on at least three (3) separate occasions, concerning the events which gave rise to the pending charge. The statements that were made during those interviews are the targets of the Defendant's Motion.

---

[1]Rule 12(d), Federal Rules of Criminal Procedure, provides that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record." As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion. Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require. See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

At sometime between May 8, and May 10, 2006, the Defendant's infant son was admitted to the intensive care unit at St. Mary's Hospital, in Duluth, Minnesota. One of the doctors who treated the boy suspected that his injuries were not accidental, and those suspicions were reported to law enforcement.  On May 10, 2006, Tisak was requested by another Special Agent to conduct interviews of the Defendant, as well as of other members of the child's family.  Tisak arrived at St. Mary's Hospital in the late afternoon, or early evening of May 10, at which time, he met with a unit nurse in pediatric intensive care.  The nurse advised Tisak that she had anticipated the arrival of law enforcement officers, and that he could conduct the interviews in a reception room, which was located in the unit.  Tisak described the reception room as being approximately nine (9) feet by thirteen (13) feet, with a window, a sink, a coffee maker, a couch, a table, and chairs.

At the suggestion of a hospital counselor, Tisak invited the child's mother to be interviewed, before he interviewed the Defendant.  Following that interview, Tisak instructed the counselor to invite the Defendant to be interviewed.  The Defendant was escorted to the reception room by the counselor, and he was seated across the table from Tisak.  Tisak identified himself as an Agent for the FBI, and he advised the Defendant that the interview was voluntary.  Tisak further informed the Defendant

- 3 -

that he was not under arrest; that he was free to leave the room at any time; and that the door would be closed for privacy reasons, but that it would remain unlocked throughout the interview.  Tisak testified that the Defendant appeared to understand the situation; that he did not ask any questions; and that he did not appear to have any concern about participating in the interview.  The Defendant appeared to be upset, which Tisak considered to be the natural reaction of a parent whose child had recently suffered a significant injury.

At the time of the interview, the Defendant was seated closer to the door than Tisak.  Tisak testified that he was dressed in plain clothes, and that he was armed, but that his firearm was concealed under his jacket.  At some point during the interview, the Defendant requested to use Tisak's jacket, in order to demonstrate where the child had been located at the time of the injury.  When Tisak removed his jacket, his firearm was visible to the Defendant, but Tisak did not remove the weapon from its holster at any time during the interview.  At different times during the interview, persons entered the reception room -- which was open to the public -- at which time, the conversation between the Defendant and Tisak would cease, in consideration of the private nature of the subject matter and, at one point, Tisak requested a person to leave the reception room.  The interview lasted approximately one (1) hour and thirty (30)

minutes.  Tisak testified that he made no efforts to intimidate the Defendant, and that he did not employ any coercive tactics, or threaten the Defendant, during the course of the interview.  Tisak also noted that the Defendant did not appear to be intoxicated, or under the influence of drugs.

After the Defendant had finished answering Tisak's questions, Tisak requested that he memorialize, in writing, the circumstances which had resulted in the injury to the Defendant's child.  The Defendant agreed to Tisak's request, and he wrote a description of the events that he had related to Tisak.  See, <u>Government Exhibit 1</u>.  As part of the statement, the Defendant noted that he made the statement "[f]reely without any influence," and that he was "not on drugs or Alcohol."  The Defendant further related that, "if it wasn't for Jeff Tisak I would not have been able to tell the truth the way he brought up everything pertaining to the cases he's [sic] worked on[,] and because of fear and self guilt he has helped me feel a lot better as to the way he explained everything to me."  The Defendant also drew a diagram of his house, and the location of the child, at the time that the child had sustained the injuries.

At the conclusion of the interview, the Defendant left the room.  He was not placed under arrest at that time, and his freedom of movement was not restrained, during the entirety of the interview.

The Defendant was interviewed for a second time on May 12, 2006, at approximately 9:56 o'clock a.m.  The interview was conducted by Silkey, and Jerry Koneczny ("Koneczny"), who is a Special Agent with the Minnesota Bureau of Criminal Apprehension ("BCA").  Silkey testified that he had requested the assistance of a BCA Agent because he preferred to have a second Agent present during interviews, but that it was not his general practice to seek the assistance of an Agent with the BCA.

The Agents first approached the Defendant in the hospital room of his child. Silkey advised the Defendant that he needed to speak with him about the child.  Silkey asked the hospital staff for an available room, in order to conduct the interview, and he was directed to a room which contained a couch, as well as a table and chairs.  At the time of the interview, both Silkey and Koneczny were dressed in plain clothes, and no weapons or handcuffs were visible to the Defendant.

At the outset of the interview, Silkey advised the Defendant that he had discovered a felony Arrest Warrant from Clay County, Minnesota, concerning a different matter, and that the Defendant would be taken into custody by an officer from the Duluth Police Department, following the interview.  Silkey then advised the Defendant of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and he

provided the Defendant with an "Advice of Rights" form, which described each of the Defendant's <u>Miranda</u> rights.  See, <u>Government Exhibit 2</u>.  Silkey instructed the Defendant to read each line of the advisory, and if he understood, and agreed with the statement, to place his initials next to the recitation of each right on the form.  See, <u>Government Exhibits 3 and 4</u>.  Silkey then instructed the Plaintiff that, if he understood his rights, and if he was willing to talk to the Agents and answer their questions, he was to sign the waiver form.  The Defendant placed his initials next to each of the rights that were listed on the form, and he then signed the form.  See, <u>Government Exhibit 2</u>.  In doing so, the Defendant acknowledged that he had read the rights that were listed, and that he understood those rights.  The Defendant also acknowledged that he was willing to answer the Agent's questions without an attorney being present.

The interview lasted approximately two (2) hours and thirteen (13) minutes.  Silkey testified that it appeared that the Defendant had not slept much, and that he was experiencing the stressors that are associated with having a seriously injured child, but that he was cooperative with the Agents.  Silkey further testified that the Defendant did not appear to be under the influence of alcohol, or any other controlled substances.  No threats or promises were made during the interview, although both Agents

repeatedly expressed their belief to the Defendant that he was not being forthright in his responses.  The Agents conveyed a sympathetic attitude towards the Defendant's situation, and they advised him that he would feel better if he told them everything that had happened.  After the interview, the Defendant was placed in the custody of the Duluth Police Department, who transported him to the St. Louis County Jail.

Silkey, and Phillip Hodapp ("Hodapp"), who is a Special Agent for the BCA, interviewed the Defendant on May 17, 2006, at approximately 8:49 p.m., in an interview room at the St. Louis County Jail.  Silkey testified that he was aware that Hodapp had significant previous experience in conducting interviews in cases which involved injuries to children.  At the time of the interview, the Defendant was in custody on the felony Arrest Warrant from Clay County.

Silkey commenced the interview by advising the Defendant that he wanted to talk to him again, about his child, and he inquired as to whether that would be "okay" with the Defendant.  See, Government Exhibits 6 and 7.  The Defendant agreed to the interview, at which time, Silkey advised the Defendant of his Miranda rights.  Silkey also presented the Defendant with an "Advice of Rights" form, which contained a recitation of the Miranda rights, as well as the statements, "I have read this statement of my rights and I understand what my rights are" and, "[a]t this time, I am willing to

answer questions without a lawyer present." See, <u>Government Exhibit 5</u>.  Silkey read

those sentences aloud to the Defendant, and he advised the Defendant that, if he were

agreeable, he should sign the waiver form.  The Defendant signed the form, and the

Agents began to ask the Defendant questions about his child.

At one point, fairly early in the interview, Silkey inquired as to whether the

Defendant's brother was present at the Defendant's home on the morning that the

child was injured.  Consistent with his representations in the interview of May 12,

2006, the Defendant represented that his brother was on his way into the house.

Shortly thereafter, Silkey advised the Defendant that it was his understanding that the

Defendant's brother had arrived at the Defendant's house on the night before the child

was injured, and the Defendant conceded that his prior statements had been inaccurate

in that respect.  Silkey proceeded to make a series of inquiries as to why the Defendant

had not been forthright in his previous representations, and the Defendant became

increasingly agitated.

During that questioning, Hodapp interjected that he had worked on a number

of cases involving "baby murders," and "baby cases," and that he was aware of a

number of inconsistencies in the statements that had been provided by the Defendant.

Silkey proceeded to identify details that the Defendant had not related to Tisak, as

well as the Defendant's false representations as to the whereabouts of his brother on the morning that the child was injured.  Shortly thereafter, Hodapp accused the Defendant of not being truthful, and he expressed his belief that the injuries to the child had not been caused by an accidental fall from the Defendant's couch.  The Defendant persisted that he was telling the truth, and that the injuries to the child were accidental.

As the interview progressed, Hodapp continued to press the Defendant about his representations concerning the cause of the injury and, at one point, Hodapp informed the Defendant of his belief that the Defendant was lying.  Hodapp continued to explain to the Defendant that there was no way that the Defendant's representations were accurate, given the nature of the injuries to the child.  Hodapp encouraged the Defendant to tell the Agents what had happened; he informed the Defendant that it would be okay; and he advised the Defendant that he would feel better if he told the Agents what happened.  Hodapp continued to accuse the Defendant of withholding pertinent details and, at one point, the Defendant told the Agents that he would probably wind up doing significant prison time, and that he was scared.  Hodapp acknowledged the Defendant's emotions, but he continued to advise the Defendant that the only way for the Defendant to "move on" would be to tell the truth, and that

the longer he delayed in telling the truth, the worse that it was going to be for him, because he needed to accept responsibility.

As the interview continued, Hodapp told the Defendant that there was no doubt that the child had been injured by another person, and that the person who injured the child was the Defendant.  When the Defendant inquired as to the legal implications, Hodapp advised him that the Agents' purpose was to determine the facts; that they already knew that the child had been severely injured, and that the Defendant had been with the child at the time of the injury.  Hodapp reiterated that the Defendant had been somewhat, but not entirely truthful, which he stated was "human nature" considering the gravity of the situation.   Hodapp reiterated that the only way for the Defendant to move on, and to "get this off [his] chest," was to tell the truth to the Agents. Hodapp repeated his admonition, that he knew that the Defendant wanted to "get this off [his] chest," and that the Defendant would feel better once he told the Agents what had happened.

After some hesitation, the Defendant told the Agents that he had shaken the child.  When the Agents inquired as to how hard he had shaken the child, the Defendant related that he had not shaken him hard, and he demonstrated the shaking to the Agents.  Hodapp again related that the child's injuries were inconsistent with

the Defendant's representations, and that the child had to have been shaken harder. In explaining this to the Defendant, Hodapp and Silkey produced autopsy pictures of a baby who had experienced a subdural hemotoma, as well as the eye of a baby with a retinal hemorrhage. The Agents advised the Defendant that the baby in the pictures was not the Defendant's child, and that the purpose of the pictures was to show the Defendant what his child's injuries looked like.

Shortly after the Defendant admitted to shaking the baby, he made several statements to the effect of he was a "D-E-A-D" person now. The officers assured him that he was not dead, although Silkey testified that, based on those statements, he had some concern that the Defendant might try to harm himself. Nevertheless, the Agents continued their questioning of the Defendant. Shortly thereafter, the Defendant requested that the Agents turn off the recording equipment. The Agents advised the Defendant that they wanted to record the entire statement, and Silkey asked the Defendant whether he would mind if the Agents continued to talk to him for a few more minutes. The Defendant noted that the Agents wanted the interview to be recorded, and he continued to answer the Agents' questions.

Upon questioning by the Agents, the Defendant characterized the level of force, that he used in shaking his child, as a four (4) on a scale of one (1) to ten (10), with

ten (10) being the hardest. Shortly after making that statement, the Defendant again requested that the recorder be turned off, and the Agents acceded to his request. Silkey testified that the interview continued for approximately ten (10) minutes after the recorder had been turned off, and that the Defendant did not make any incriminating statements during that time. The entire interview lasted approximately forty-five (45) minutes, and it ended when the Agents did not have any more questions for the Defendant.

## III.  Discussion

A.     The Defendant's Motion to Suppress Statements.

1.     Standard of Review.  Government agents are not required to administer Miranda warnings to everyone they question.  See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  Rather, Miranda warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"  Stansbury v. California, 511 U.S. 318, 322 (1994), quoting Miranda v. Arizona, supra at 444; United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); Berkemer v. McCarty, 468 U.S. 420, 428-29 (1984).  Once a suspect is in police custody and subject to interrogation, the suspect must be informed of his constitutional right to remain silent, and to be represented by legal

counsel during questioning.  See, <u>Miranda v. Arizona</u>, supra at 473; see also, <u>Dormire v. Wilkinson</u>, 249 F.3d 801, 804 (8th Cir. 2001).

"In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." <u>Stansbury v. California</u>, supra at 322, quoting <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983).  A list of common indicia of custody, that has been identified by our Court of Appeals, includes the following:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

<u>United States v. Griffin</u>, 922 F.2d 1343, 1349 (8th Cir 1990); see, <u>United States v. Ollie</u>, 442 F.3d 1135, 1137 (8th Cir. 2006); <u>United States v. Czichray</u>, 378 F.3d 822, 827 (8th Cir. 2004), cert. denied 544 U.S. 1060 (2005); <u>United States v. Axsom</u>, 289 F.3d 496, 500, 501 (8th Cir. 2002).

- 14 -

However, these factors "are by no means exhaustive and should not be applied ritualistically, counting indicia which contribute to custody against those which detract." United States v. Brave Heart, 397 F.3d 1035, 1039 (8th Cir. 2005), citing United States v. Czichray, supra at 827.  Instead, the Griffin factors serve as a guide to the resolution of the ultimate inquiry of "whether the defendant was restrained as though he were under formal arrest."  See, United States v. Czichray, supra at 827.

Whether or not Miranda is implicated, the Supreme Court has recognized that, in order for a confession to be admitted into evidence, it must be voluntary if it is to satisfy the Fifth Amendment's right against self-incrimination.  See, Dickerson v. United States, 530 U.S. 428, 433-34 (2000).  For a confession to be considered voluntary, a Court must examine "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession."  Dickerson v. United States, supra at 434, citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973).

As the Supreme Court has recently explained:

> The due process test takes into consideration "the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation." [Schneckloth v. Bustamonte, 412 U.S. at 226.]  See also Haynes [v. Washington, 373 U.S. 503, 513] (1963); Gallegos v. Colorado, [370 U.S. 49, 55] (1962); Reck v. Pate, [367 U.S. 433, 440] (1961) ("[A]ll the circumstances attendant upon the confession must be taken into account");

> Malinski v. New York, [324 U.S. 401, 404] (1945) ("If all the attendant circumstances indicate that the confession was coerced or compelled, it may not be used to convict a defendant").   The determination "depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing." Stein v. New York, [346 U.S. 156, 185] (1953).

Id. at 434.

Among the circumstances, which are to be considered in this analysis are, first and foremost, whether a Miranda warning has been given, see, Withrow v. Williams, 507 U.S. 680, 693 (1993); any elements of "police coercion," see, Colorado v. Connelly, 479 U.S. 157, 167 (1986); the length of the interrogation, see, Ashcraft v. Tennessee, 322 U.S. 143, 153-154 (1944); the location of the interrogation, see, Reck v. Pate, 367 U.S. 433, 441 (1961); and the continuous nature of the interrogation, see, Leyra v. Denno, 347 U.S. 556, 561 (1954).   See also, Withrow v. Williams, supra at 693 (listing the applicable considerations). However, "[w]e cannot find that a statement was involuntary unless it is established that law enforcement officials engaged in coercive activity."   United States v. Bordeaux, 400 F.3d 548, 560 (8th Cir. 2005).

2.   Legal Analysis.  The Defendant has challenged the admissibility of the statements, that he made during his initial interview on May 10, 2006, as well as the interviews that were conducted on May 12, and May 17, 2006, respectively.  We address the circumstances of each of the Defendant's statements, in turn.

a.    <u>The Interview of May 10, 2006</u>.  As noted, the interview of May 10, 2006, was conducted by a single FBI Agent, in a hospital reception room.  Prior to the interview, the Defendant was advised that he was not under arrest; that the interview was voluntary; that he was free to leave; and that the door would be closed for privacy purposes, but that it would remain unlocked.  There has been no suggestion that the Defendant's freedom of movement was restrained in any way, during the course of the interview, and the Defendant was not arrested at the interview's conclusion.

Moreover, there is nothing to suggest that Tisak employed any deceptive stratagems, or strong arm tactics, or even used a raised voice at any time during the interview.  Accordingly, after applying the <u>Griffin</u> factors, we find that the Defendant was not in custody during the interview on May 10, 2006.  See, <u>United States v. Bruguier</u>, 161 F.3d 1145, 1152 (8th Cir. 1998)(defendant was not in custody where the interview was conducted in a room at a hospital, the defendant was free to leave at any time, and the defendant was not arrested at the conclusion of the interview).

We also find that the Defendant's statements during, the interview of May 10, 2006, were voluntarily made.  Notably, the Record is devoid of any evidence that Tisak made any threats or promises to the Defendant, or used any coercive tactics

during the questioning. Similarly, no suggestion has been made that the Defendant failed to understand the nature of the interview, or his ability to refrain from answering Tisak's questions. Rather, Tisak's uncontradicted testimony reflects that Defendant appeared to understand the circumstances of the interview, and the Defendant acknowledged, in his written statement, that the answers he had made to Tisak, were made "freely" and "without any influence." Government Exhibit 1. Therefore, while the Defendant's written statement suggests that Tisak encouraged the Defendant to speak with him by relating circumstances from other cases, in which Tisak had been involved, we find that, under the totality of the circumstances, the Defendant's statements, during the interview of May 10, 2006, were entirely voluntary, and the Defendant's Motion to Suppress those statements should be denied.

b.    The Interview of May 12, 2006. The Record is uncontested that, prior to the interview, the Defendant was advised of his Miranda rights, and that he waived those rights by signing an "Advice of Rights" form, which contained the statement: "I have read this statement of my rights and I understand what my rights are," and "[a]t this time, I am willing to answer questions without a lawyer present." See, Government Exhibit 2. Accordingly, since there is nothing in the Record to suggest that any of the officers utilized coercive tactics, in the procurement of that

waiver, we find that the Defendant knowingly, intelligently, and voluntarily, waived his Miranda rights.

Moreover, under the "totality of the circumstances," we also find that the Defendant's statement was voluntarily given. "[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." United States v. Astello, 241 F.3d 965, 966 (8th Cir. 2001), cert. denied, 533 U.S. 962 (2001), quoting Berkemer v. McCarty, supra at 433; see, United States v. Annis, 446 F.3d 852, 856 (8th Cir. 2006)("[M]aintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of voluntary waiver."), quoting Missouri v. Siebert, 542 U.S. 600, 609 (2004).

As our Court of Appeals has recognized:

> To state the obvious, "interrogation of a suspect will involve some pressure because its purpose is to elicit a confession." [United States v. Astello, 241 F.3d 965, 967 (8th Cir. 2001), cert. denied, 533 U.S. 962 (2001)]. "[T]he fact that the tactics produced the intended result * * * does not make a confession involuntary." Id. at 968. In other words, 'there is nothing inherently wrong with efforts to create a favorable climate for confession." United States v. LeBrun, 306 F.3d 545, 555 (8th Cir. 2002)(internal citations omitted. "'[Q]uestioning tactics such as a raised voice,

- 19 -

> deception, or a sympathetic attitude will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.'" Astello, 241 F.3d at 967 (quoting Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993)).  Nor will a promise of leniency, an "expressed disbelief in the statements of a suspect * * *, or lie[s] to the accused about the evidence against him" necessarily render a confession involuntary.  Wilson v. Lawrence County, 260 F.3d 946, 953 (8th Cir. 2001) (internal citations omitted).  Rather, the coercive conduct must be "such that the defendant's will was overborne and his capacity for self determination critically impaired." Astello, 241 F.3d at 967 (internal citations omitted).

United States v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002); see, United States v. Brave Heart, 397 F.3d 1035, 1041 (8th Cir. 2005); United States v. LeBrun, 363 F.3d 715, 725-26 (8th Cir. 2004), cert. denied, 543 U.S. 1145 (2005); see also, United States v. Martin, 369 F.3d 1046, 1052-53, 1056 (8th Cir. 2004).

Our review of the recorded statement reveals that the Agents repeatedly informed the Defendant that his explanation, concerning the cause of his child's injuries, was inconsistent with the nature of the injuries themselves, which were believed to be non-accidental.  The Agents further related their belief that the Defendant was omitting pertinent details, as to what had caused the child's injuries, and that he would feel better if he told them what had happened.

Considering the totality of the circumstances, we do not believe that the Defendant's will was overborne by the questioning techniques that were employed by the Agents.  Notably, the interview was conducted in a reception room; no firearms

- 20 -

or handcuffs were visible to the Defendant; and no threats or promises were made during the interview.  In questioning the Defendant, the Agents did not use raised voices, and there has been no suggestion that the Agents employed any methods of physical intimidation.  Rather, our review of the interview reveals that the Defendant's statements, in response to the Agents' questions, were made on his own volition, and without coercion.  Therefore, based on the totality of the circumstances, we find that the Defendants statements, during the interview of May 12, 2006, were knowing and voluntary, and should not be suppressed.

      c.    <u>The Interview of May 17, 2006</u>.  Much like the interview of May 12, we find that the Defendant knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights.  Prior to any questioning, Silkey advised the Defendant of his <u>Miranda</u> rights, and he presented the Defendant with an "Advice of Rights" form, which the Defendant signed -- thereby expressly acknowledging that he understood his rights, and that he was willing to waive those rights and proceed without the presence of an attorney.  Furthermore, the Record is bereft of any suggestion that the Agents employed any coercive tactics, or deceptive technics, in eliciting the waiver.

We also find that, considering the "totality of the circumstances," the Defendant's statement was voluntarily given.  In so finding, we are guided by the

Court's analysis in <u>United States v. Brave Heart</u>, supra at 1037, 1041, where officers, acting under similar circumstances, employed many of the same techniques during an interview with the defendant. In <u>Brave Heart</u>, the defendant was interviewed by law enforcement officers, after his infant nephew had died in his care. <u>Id.</u> at 1036. During that interview, the defendant explained that the child became nonresponsive when the defendant's one-year-old son struck him in the head with a toy. However, a subsequent forensic examination revealed that the child had died due to bleeding on both sides of his head, which was inconsistent with the defendant's representations. <u>Id.</u>

Upon the request of a Special Agent with the FBI, the defendant agreed to answer questions concerning the death of the child. The defendant was not provided with a <u>Miranda</u> warning and, after approximately one (1) hour -- during which time the defendant recited a version of events that was consistent with his previous representations -- the Agent, as well as another officer, left the room. <u>Id.</u> at 1037. Approximately ten (10) minutes later, the Agent re-entered the room, and adopted a more "accusatory" tone. Specifically, the Agent advised the defendant that the medical evidence showed that the defendant was responsible for the death of the child. <u>Id.</u> The Agent continued by expressing his understanding of "the stress and pressure

that [the defendant] was under * * * taking care of three small children." Id.  The Agent further identified the "burden" that the defendant was carrying, as well as the Agent's "need[] to know the truth," and he expressed his belief that the defendant would feel better if he told the Agent what had happened.  Id.  The defendant subsequently admitted to striking the child's head on a window frame, and to have "head-butted" the child.  After making this admission, the Defendant provided the Agent with a recorded statement.

Based upon those circumstances, the Trial Court suppressed the defendant's statements, as being involuntary.  The Court of Appeals disagreed with that finding, and reasoned as follows:

> [W]e note that officers elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices. Astello, 241 F.3d at 967-68.  None of these tactics render a confession involuntary, however, unless "the overall impact of the interrogation caused the defendant's will to be overborne." Jenner, 982 F.2d at 334. [The defendant] is not a sophisticated man, but he is not a minor, he has completed the eleventh grade, he has had at least some prior experience with the criminal justice system, and he did not have difficulty understanding the questions put to him.  These characteristics weigh in favor of the voluntariness of his confession.  The record as a whole demonstrates that [the defendant] confessed because

> his conscience prevailed upon him to do so, not because the
> environment and nature of the questioning was so coercive
> that it overbore his will and critically impaired his capacity
> for self-determination.

Id. at 1041.

Here, the Agents employed a number of questioning tactics that were similar to those

which were utilized in Brave Heart.  Specifically, the Agents told the Defendant that

they knew that the child's injuries had been caused by the Defendant; they expressed

their belief that the Defendant was not being truthful; they expressed an understanding

of Defendant's position, as well as the stressors of child rearing; and they made

repeated appeals to the Defendant's conscience.  The Agents further noted that the

Defendant had not been forthright in his previous representations, and they repeatedly

pressed him concerning why he had not been truthful.  The Agents also showed the

Defendant autopsy pictures of babies, who had suffered injuries that were similar to

those of the Defendant's child.  While the pictures were graphically disturbing, the

Defendant was informed that the pictures of the babies were not of his child.

Whether tactics, such as those which were employed by the interrogating

Agents here, have overborne the will of a suspect presents "a very demanding

standard," United States v. LeBrun, supra at 726, which we find absent here.  Notably,

the information that was known to the officers, as well as the inconsistencies in the

- 24 -

representations that had been made by the Defendant, plainly suggested that the Defendant was not being forthright in his answers to their questions. Moreover, while the Defendant stated that he was "scared," we do not overlook the fact that he had been contemporaneously apprised of his rights under Miranda; he had acknowledged his understanding of those rights, and he had agreed to answer the officers' questions.

In view of the Record as a whole, we conclude that, under the totality of the circumstances, the Defendant's will was not overborne by the questioning techniques that were employed by the interviewing officers, and further, that his statements were the product of his own free will. See, United States v. Brave Heart, supra at 1041; United States v. LeBrun, supra at 718 (statements were voluntary despite the absence of a Miranda warning, and the officers' use of pictures depicting life events of the defendant, as well as "psychological ploys," such as representations that the defendant was the primary suspect; that there was a significant amount of evidence against him; and that a protracted Trial would drain his finances, and ruin his family's reputation). There is nothing in the Record presented that so much as intimates that the photographs shown to the Defendant were distressingly graphic, emotionally charged, or otherwise designed to force an incriminating response. Rather, the Record is uncontroverted that the photographs were clinical in nature, and their source was

explained to the Defendant to assure that he would not misunderstand the photos to be portraying his son's medical condition.[2]

We do not suggest that the officers' interrogation was devoid of any pressure, this was not party repartee, but we simply conclude that the pressure employed was not so overwhelming as to deprive the Defendant of his ability to follow his own free will, and his best judgment.  Therefore, since we find that each of the Defendant's statements were voluntary, and were not otherwise obtained in violation of the protections set forth in Miranda v. Arizona, supra, we recommend that the Defendant's Motion to Suppress Statements be denied.

NOW, THEREFORE, It  is –

---

[2]Indeed, if the photographs were believed to hold the capacity to overwhelm the Defendant's will, we are confident that they would have been introduced for our review, and assessment of their compelling nature.

RECOMMENDED:

That the Defendant's Motion to Suppress Statements, Admissions, and Answers Motion [Docket No. 14] be denied.


Dated:  July 24, 2006                                   s/Raymond L. Erickson
                                                        Raymond L. Erickson
                                                        CHIEF U.S. MAGISTRATE JUDGE


## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than August 10, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than August 10, 2006**, unless all interested

- 27 -

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to

review the transcript in order to resolve all of the objections made.